IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

_____

WILLIAM R. CHEATHAM and MARCUS HUEY, *Plaintiffs/Appellees*,

*v.*

SAL DICICCIO in his official capacity as a member of the Phoenix City Council; CITY OF PHOENIX; PHOENIX LAW ENFORCEMENT ASSOCIATION, *Defendants/Appellants,*

_____

THOMAS COX; VICTOR ESCOTO; RICHARD V. HARTSON; VIVIAN REQUE; and DAVID K. WILSON, *Intervenors/Appellants*.

_____

WILLIAM R. CHEATHAM and MARCUS HUEY, *Plaintiffs/Appellees,*

*v.*

PHOENIX LAW ENFORCEMENT ASSOCIATION, *Defendant/Appellant.*

Nos. 1 CA-CV 13-0364; 1 CA-CV 14-0135
Consolidated
FILED 8-11-2015

_____

Appeal from the Superior Court in Maricopa County
No. CV2011-021634
The Honorable Katherine M. Cooper, Judge

**AFFIRMED IN PART; VACATED IN PART**

_____

Scharf-Norton Center for Constitutional Litigation
at the Goldwater Institute, Phoenix
By Clint Bolick, Jonathan Matthew Riches
*Counsel for Plaintiffs/Appellees*

Sherman & Howard, LLC, Phoenix
By John Alan Doran, Lori Wright Keffer, Matthew A. Hesketh
*Counsel for Defendants/Appellants*
Napier, Coury & Baillie, PC, Phoenix
By Michael Napier, Kathryn R.E Baillie
*Counsel for Defendants/Appellants Phoenix Law Enforcement Association*

Judicial Watch, Inc., Washington, DC
By Paul J. Orfanedes, Chris Fedeli
*Counsel for Defendants/Appellants*

Gomez & Petitti, PC, Phoenix
By David F. Gomez, Michael J. Petitti Jr.
*Counsel for Intervenors/Appellants*

---

**OPINION**

Judge Randall M. Howe delivered the opinion of the Court, in which Presiding Judge Samuel A. Thumma and Judge John C. Gemmill joined.

---

**H O W E**, Judge:

¶1        The City of Phoenix ("City") and the intervenor police officers and the Phoenix Law Enforcement Association (collectively, "PLEA") appeal the trial court's order enjoining enforcement of "release time" provisions of the 2012–14 Memorandum of Understanding ("MOU") between the City and PLEA. Under this agreement, the City paid PLEA approximately $1.7 million in release time, which is time police officers are released from police duties for the City to allow them to perform PLEA activities and business. The City and PLEA argue that the trial court erred by finding the release time provisions violated the Arizona Constitution's Gift Clause. Because the release time provisions do not require PLEA to perform any specific duties, however, any benefit the City received from the release time was grossly disproportionate to the City's $1.7 million

payments to PLEA. Accordingly, neither the City nor PLEA has shown that the trial court erred in holding that the release time provisions violated the Gift Clause. For these reasons, we affirm the trial court's injunction of the 2012–14 MOU release time provisions and prohibition of the City and PLEA from having release time provisions in their MOUs, unless mandatory language obligates PLEA to perform specific duties in exchange for the release time. We vacate the trial court's other requirements in that order, however, because they are not properly part of the consideration analysis.

## FACTS AND PROCEDURAL HISTORY

¶2          The City of Phoenix's employees are divided into various units, with Unit 4 consisting of 2,500 police officers below the rank of sergeant. PLEA is a labor organization that represents the police officers of Unit 4. Of Unit 4's 2,500 members, 2,150—nearly ninety percent—are PLEA members. Among other things, PLEA advocates for its members by negotiating contracts with the City and representing members in administrative, civil, and criminal proceedings.

¶3          Every other year, the City and PLEA negotiate a new MOU. MOUs govern the officers' wages, hours, and other conditions of employment. *See* PHOENIX, ARIZ., CODE art. XVII, §§ 2–209, –210(11), –214, –215, –218 (1976). A complete MOU is submitted to the Phoenix City Council for approval. *See id.* §§ 2–210(12), –215(C). Every MOU since 1977—when the arrangement began—has included provisions for "release time," which is "the practice of relieving police officers from police duties to perform PLEA activities and conduct PLEA business." The 2010–12 MOU prescribed four categories of release time. The first category—provided in § 1.3.G and Q—authorized six full-time officers to receive full pay and benefits with 160 hours of overtime per year. The second category— provided in § 1.3.G—allocated to other officers a bank of 1,583 release time hours per year for "legitimate association business," which includes preparation for negotiations with the City. The third category—provided in § 1.3.K—allotted 15 days of paid leave per year for officers to attend PLEA seminars, lectures, and conventions. The final category—provided in § 1.3.I.6—authorized officers to serve as legislative representatives who received 500 release time hours per year to represent PLEA.

¶4          In 2011, William R. Cheatham and Marcus Huey (collectively, "Cheatham") sued the City, challenging the 2010–12 MOU release time provisions,  section 1.3.G, K, and Q, and seeking injunctive and declaratory relief. Cheatham argued that the release time provisions were unconstitutional under the Gift Clause. The clause is violated if, when the

government contracts with a private entity to expend funds, the funds are not used for a public purpose or the government's expenditure is "grossly disproportionate" to what it receives in return. *Turken v. Gordon*, 223 Ariz. 342, 345 ¶ 7, 224 P.2d 158, 161 (2010).

¶5        In June 2012, after an evidentiary hearing on Cheatham's application for preliminary injunction, the trial court concluded as a matter of law that "at least some applications of release time [were] not for a public purpose," such as negotiating contracts for members, lobbying for favorable legislation, and attending PLEA functions. The court also concluded that PLEA did not provide adequate consideration for the benefit it received under the agreement because it was not required to "perform specific service or give anything in return" for the release time. In doing so, the court found as fact that the "MOU [did] not obligate PLEA to provide any services to the City in exchange for the compensation and benefits the City [gave] to PLEA for release time." The court therefore preliminarily enjoined the 2010–12 MOU release time provisions.

¶6        A few weeks later, the 2010–12 MOU expired, and the 2012–14 MOU became effective. The 2012–14 MOU largely authorized the same release provisions as those contested in the 2010–12 MOU, with certain changes. First, the allocated overtime hours for the six full-time officers increased from 160 to 960 hours. Second, the bank of release time for "legitimate association business" increased from 1,583 to 1,859 hours. Third, the MOU provided an unspecified bank of paid leave time for officers designated as association representatives to attend meetings and hearings without losing pay or benefits. Time used for any other purposes, however, had to be subtracted from the 1,859 release time hours. The amount the City paid for the release time provisions in the 2012–14 MOU was approximately $1.7 million.

¶7        Cheatham filed an amended complaint challenging the 2012–14 MOU release time provisions, section 1-3.B, C, and Q.[1] After another evidentiary hearing, the trial court concluded that these provisions of the 2012–14 MOU violated the Gift Clause. The court determined that release time did not advance a public purpose. As relevant here, the court also determined that the exchange lacked consideration, based on its factual findings that the MOU did "not obligate PLEA to provide any services to

---

[1]        In the 2012–14 MOU, section 1-3.B provided for the six full-time release positions, PLEA representatives, and a bank of 1,859 hours of release time; section 1-3.C provided for the legislative representatives; and section 1-3.Q provided for the full-time release officers' 960 hours of overtime.

the City in exchange for the compensation and benefits the City [gave] to PLEA for the release time" and did not "obligate[] PLEA to perform any of the 'examples' [listed in the MOU] or do anything in exchange for release time with the possible exception of Section 1-3.Q." Consequently, the court preliminarily enjoined the 2012–14 MOU release time provisions.

¶8        In January 2014, the trial court held a bench trial on Cheatham's request to permanently enjoin the 2012–14 MOU release time provisions. The City and PLEA argued that the provisions should not be analyzed under the Gift Clause because release time was a benefit—part of the officers' compensation package—not a payment or subsidy. The court rejected that argument because: (1) the MOU did not classify release time as compensation; (2) compensation was a mandatory subject of bargaining in the MOUs, whereas release time was not; (3) the City did not treat release time as compensation; and (4) city funds for release time were designated for PLEA, not the officers.

¶9        Incorporating its preliminary injunction orders, the trial court concluded that the release time provisions violated the Gift Clause. The court again determined that the provisions did not serve a public purpose. Noting that "release time is permissible if the duties imposed are substantial and the cost is modest," the court then determined that PLEA did not provide adequate consideration for the City's payment for release time because: (1) the 2012–14 MOU imposed no duties on PLEA; (2) the City had no control over how the release time would be used; and (3) the City had no system to evaluate the costs versus the benefit of release time. Further, the court reasoned that the benefits PLEA identified—promising not to strike, promoting "cooperation, better communication, labor peace, and good relations"; being "available for stand-by, call-out, and critical incidents"; and representing officers in disciplinary and grievance proceedings—were either indirect benefits or preexisting legal obligations that could not constitute consideration.[2]

---

[2]        The trial court also rejected the City and PLEA's argument that the Gift Clause analysis required Cheatham to show that the City Council abused its discretion in approving the 2012–14 MOU, determining that no such finding was necessary. The court noted, however, that even if such a finding was necessary, the City abused its discretion because it approved the MOU without (1) knowing the cost of the release time; (2) requiring PLEA to keep written records of its use of release time; and (3) implementing a system to evaluate the cost and benefit of release time.

¶10 Based on these factual findings and conclusions of law, the trial court permanently enjoined the 2012–14 MOU release time provisions. It also permanently enjoined the City and PLEA from entering into future MOUs or agreements with release time, unless the MOU or agreement provided a public benefit in obligatory language, required PLEA to reimburse the City for release time that did not directly benefit the City, implemented an accountability system for the use of release time, instituted a cost/benefit evaluation mechanism for release time, and prohibited using release time for lobbying activities.

¶11 The City and PLEA timely appealed. We consolidated the appeal with an earlier appeal from the preliminary injunction of the 2012–14 MOU. Because the court subsequently granted the permanent injunction, the preliminary injunction is moot. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 314 (1999) ("[A]n appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter."). Accordingly, this opinion only addresses whether the trial court correctly granted the permanent injunction.

## DISCUSSION

¶12 The City and PLEA argue that the trial court erred because the 2012–14 MOU release time provisions had a public purpose of developing a harmonious and cooperative relationship between the City and its employees and because Cheatham did not show that the City received consideration that was grossly disproportionate to its expenditure.[3] Although the 2012–14 MOU release time provisions are moot due to the passage of time, we will nonetheless address the constitutionality of the provisions because of the breadth of the trial court's permanent injunction and the issue is clearly capable of repetition—as this case demonstrates.

---

[3] PLEA contends initially that the Gift Clause is inapplicable because release time is a benefit that is part of the police officers' compensation package. We reject this argument—as did the trial court—because release time is not part of the compensation package paid to each officer. Because release time requires the City to expend money on officers who work under the direction of a private entity, the propriety of the release time provisions is properly resolved under the Gift Clause.

¶13         We review the granting of a permanent injunction for an abuse of discretion. *Kromko v. City of Tucson*, 202 Ariz. 499, 501 ¶ 4, 47 P.3d 1137, 1139 (App. 2002). We defer to the trial court's factual findings absent clear error, *Clark v. Renaissance West, LLC*, 232 Ariz. 510, 515 ¶ 21, 307 P.3d 77, 82 (App. 2013), but review de novo the interpretation and application of constitutional provisions, *Ross v. Bennett*, 228 Ariz. 174, 176 ¶ 6, 265 P.3d 356, 358 (2011). As applicable here, we presume that the governmental enactment is constitutional and will uphold it unless it clearly is not. *See Cave Creek Unified School Dist. v. Ducey*, 233 Ariz. 1, 5 ¶ 11, 308 P.3d 1152, 1156 (2013). A party challenging the enactment has the burden of establishing its unconstitutionality. *Eastin v. Broomfield*, 116 Ariz. 576, 580, 570 P.2d 744, 748 (1977).

### 1. The Gift Clause

¶14         Along with other prohibitions, the Gift Clause provides:

> Neither the state, nor any county, city, town, municipality, or other subdivision of the state shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation.

ARIZ. CONST. art. IX, § 7. The Gift Clause "was designed primarily to prevent the use of public funds raised by general taxation in aid of enterprises apparently devoted to quasi public purposes, but actually engaged in private business." *Turken*, 223 Ariz. at 346 ¶ 10, 224 P.3d at 162 (quoting *Day v. Buckeye Water Conservation & Drainage Dist.*, 28 Ariz. 466, 473, 237 P. 636, 638 (1925)). Consistent with its design, Gift Clause cases generally involve real property or rights that can be and are readily valued in the marketplace. *See, e.g.*, *id.* at 345, 224 P.3d at 161 (parking garage spaces); *Arizona Ctr. for Law in Pub. Interest v. Hassell*, 172 Ariz. 356, 361, 366, 837 P.2d 158, 163, 168 (App. 1991) (interest in riverbed land); *Defenders of Wildlife v. Hull*, 199 Ariz. 411, 415, 18 P.3d 722, 726 (App. 2001) (same); *Kromko v. Ariz. Bd. of Regents*, 149 Ariz. 319, 322, 718 P.2d 478, 481 (1986) (hospital and leased underlying land). The Gift Clause "represents the reaction of public opinion to the orgies of extravagant dissipation of public funds by counties, townships, cities, and towns in aid of the construction of railways, canals, and other like undertakings during the half century proceeding 1880." *Day*, 28 Ariz. at 473, 237 P. at 638 (quoting *Thaanum v. Bynum Irrigation Dist.*, 232 P. 528, 530 (Mont. 1925)).

¶15         Gift Clause jurisprudence has focused on two general purposes of the clause: (1) avoiding the "depletion of the public treasury or

7

inflation of public debt by engagement in non-public enterprise" and (2) ensuring that public funds are not used to foster or promote the purely "private or personal interest of any individual." *Kromko*, 149 Ariz. at 320–21, 718 P.2d at 479–80 (internal quotation marks and citations omitted). The Arizona Supreme Court has developed a two-part test from these principles: the government may not provide public funds to a private entity unless (1) the expenditure is used for a public purpose and (2) the consideration received by the government is not "grossly disproportionate" to the amount paid to the private entity. *Turken*, 223 Ariz. at 345, 351 ¶¶ 7, 41, 224 P.3d at 161, 167. To comply with the Gift Clause, the expenditure must pass both prongs of this two-part test. *Id.* at 348 ¶ 22, 224 P.3d at 164.

**¶16**          In resolving whether the release time provisions violate the Gift Clause, we do not need to determine whether the expenditure for release time serves a public purpose because our resolution of the consideration prong is dispositive. As discussed below, assuming a proper public purpose, neither the City nor PLEA has shown that the trial court erred in finding that the City's expenditure for the release time was grossly disproportionate to what it received in return, given the lack of obligation imposed on PLEA in the 2012–14 MOU release time provisions.

**¶17**          The government receives adequate consideration if it does not pay a "grossly disproportionate" amount for what it receives in return.[4] *See generally Turken*, 223 Ariz. at 349–52 ¶¶ 30–49, 224 P.3d at 165–68. Consideration "has a settled meaning in contract law. . . . [It] is what one party to a contract obligates itself to do (or to forbear from doing) in return for the promise of the other contracting party." *Id.* at 349 ¶ 31, 224 P.3d at 165. Courts do not ordinarily examine the proportionality of consideration between parties contracting at arm's length. *Id.* at ¶ 32. Analysis of consideration under the Gift Clause, however, differs in that it focuses on the adequacy of consideration "because paying far too much for something

---

4          Contrary to the trial court's analysis, *Kromko* and *Hassell* do not support the notions that the consideration analysis also requires examining how the government controls the resources that are used and whether the government has a mechanism to evaluate the costs versus benefits, respectively. *See generally Kromko*, 149 Ariz. at 320–21, 718 P.3d at 479–80 (discussing consideration, but not holding that retention of control over the use of government funds factored into the consideration analysis); *Hassell*, 172 Ariz. at 368–69, 837 P.2d at 170–71 (discussing consideration, but not holding that the general Gift Clause analysis—involving cases not within the purview of the Public Trust Doctrine—required conducting a line-item, cost-benefit analysis).

effectively creates a subsidy from the public to the seller." *Id.* at 350 ¶¶ 32–33, 224 P.3d at 166. The private entity must provide the government with bargained-for consideration focusing on the "objective fair market value" of what the private party has promised to provide in return for the public funds expended. *See id.* The sufficiency of such consideration must be judged at the time of the transaction. *See id.* at ¶¶ 32–39 (treating consideration as part of the bargaining process).

¶18  In addressing the adequacy of consideration under the Gift Clause, we analyze whether a contract obligates a private entity to perform specific duties in exchange for the expenditure. In *Wistuber v. Paradise Valley Unified School District*, the Arizona Supreme Court upheld a release time provision, as relevant here, where the contract (a collective bargaining agreement) expressly obligated a teacher's association president to perform specific duties in relation to the school district. 141 Ariz. 346, 687 P.2d 354 (1984). In the contract, the district released the association's president from teaching duties, but continued to pay a portion of her salary in return for her performing activities and duties inuring to the benefit of the district. *Id.* at 348, 687 P.2d at 356. The contract expressly stated that the association president "agrees [with the District] to" undertake ten specific, quantifiable, and verifiable obligations and specified the amount of time in hours she was required to spend on district, as opposed to union, work. *Id.* at 348 n.3, 687 P.2d at 356 n.3. Although acknowledging many of the president's obligations were duties that "she might have performed in any event" as association president, *id.* at 349–50, 687 P.2d at 357–58, the Court nonetheless found that the consideration was not grossly disproportionate to the expenditure, *id.* at 350, 687 P.2d at 358.

¶19  As noted more recently in *Turken*, the basis for that conclusion in *Wistuber* was that "the duties imposed on the union president under the challenged agreement were 'substantial, and the relatively modest sums required to be paid by the District not so disproportionate as to invoke the constitutional prohibition'" of the Gift Clause. *Turken*, 223 Ariz. at 347 ¶ 18, 224 P.3d at 163 (quoting *Wistuber*, 141 Ariz. at 350, 687 P.2d at 358). In *Turken*, the Arizona Supreme Court made plain that the proper focus in assessing the adequacy of consideration is what the private entity "has promised to provide in return" for payments by the government. *Id.* at 350 ¶ 35, 224 P.3d at 166. Accordingly, in *Turken*, the Court rejected the argument that indirect benefits, such as projected sales tax revenue, constituted adequate consideration. *Id.* at ¶ 38. The contract there did not obligate the developer to produce the tax revenue for the City's benefit. *Id.* The only benefit the City objectively bargained for was exclusive use of 200 parking spaces, of 3,180 total. *Id.* at 351 ¶ 42, 224 P.3d at 167. The Court

observed—because the trial court did not separately address the value of the parking spaces—that $97.4 million was "quite likely" a grossly disproportionate amount to pay for the benefit of only 200 parking spaces. *Id.* at ¶ 43.

¶20          As applied, the question is whether the trial court erred in determining that the City's payment to PLEA—$1.7 million over the course of two years for release time—was grossly disproportionate to what the 2012–14 MOU obligated PLEA to provide to the City in return—staffing PLEA with police officers to perform labor-relations functions. Although listing examples of uses for release time, the 2012–14 MOU release time provisions do not obligate PLEA to perform any specific duty or give anything in return for the release time, meaning the City receives no consideration "for *Wistuber* purposes" for its expenditure. *Id.* at ¶ 41. In other words, the City does not receive a staffed union in exchange for the release time. Unlike the detailed, mandatory contractual provisions upheld in *Wistuber* that specified in an enforceable manner what the association president was required to do, the 2012–14 MOU release time provisions do not require that officers in the full-time release positions perform any specific duties. Instead, the provisions provide examples about what release hours may be used for, *see* 2012–14 MOU § 1-3.B, B.3, and what PLEA representatives may do, *see id.* § 1-3.B.2.1. Unlike in *Wistuber*, no enforceable duties are specified for such efforts in the 2012–14 MOU.

¶21          One possible exception is § 1-3.Q, which states that the "full-time release positions agree to participate" in unspecified "citywide task committees" and in exchange "the City agrees to provide" a bank of 960 hours of overtime. That provision, however, is located in the portion of the 2012–14 MOU defining PLEA's rights, not its obligations or duties. *See generally id.* § 1.3. Neither the City nor PLEA has shown how a declaration of PLEA's rights properly could be used to define PLEA's duties. Nor does the delineation of the City's rights in the 2012–14 MOU specify obligations or duties about the release time provisions or even mention the release time provisions. Regardless, for the full-time release positions, the 2012–14 MOU simply provides a list of "[e]xamples of work performed by the release positions," *see id.* § 1-3.B, with no language limiting the use of release time to these "examples" and no binding contractual language attached to these examples, such as "shall," "must," or "promises," otherwise obligating PLEA to perform them in exchange for the release time.

¶22          The 2012–14 MOU terms describing the PLEA representatives' duties also are permissive and non-binding. They state that PLEA "*may* designate up to forty-two (42)" representatives, *id.* § 1-3.B.2

(emphasis added), and "[u]p to two PLEA representatives *may . . .* attend" meetings and hearings and "*may* attend hearings with the department representative," *id.* § 1-3.B.2 (emphasis added). Like the other release positions, the 2012–14 MOU includes only "[e]xamples of how these hours are used by [PLEA]," with no binding contractual language for the bank of release hours. *See id.* § 1-3.B.3. Finally, the 2012–14 MOU assigns no duties to the legislative representative. *See id.* § 1-3.C. Consequently, the record supports the trial court's findings, and neither the City nor PLEA has shown that the court's findings are erroneous. *See In re U.S. Currency in the Amount of $2,390*, 229 Ariz. 514, 516 ¶ 5, 277 P.3d 219, 221 (App. 2012) (providing that an appellate court will not disturb the trial court's factual findings unless they are clearly erroneous). Accordingly, the trial court correctly enjoined § 1-3.B, C, and Q of the 2012–14 MOU after finding that those release time provisions did not obligate PLEA to provide any specific duty in exchange for the release time.

¶23        The City and PLEA counter that the trial court erred because it failed to consider eleven other "direct, tangible promises made by PLEA in the 2012–14 MOU." These provisions, however, do not obligate PLEA to perform any duties *in exchange for the release time*. For example, PLEA has agreed that it "will have two (2) PLEA positions . . . on continuous paid stand-by," 2012–14 MOU § 1-3.N, and that it "will have the most readily available unit" representative available in situations where a unit member requests individual representation, *id.* § 1-4.B.1. But these and other provisions the City and PLEA rely on are obligations unique to PLEA as an organization; they are not duties PLEA has obligated itself to perform to the City in a bargained-for exchange for the release time. In fact, nothing in the 2012–14 MOU states that these provisions apply to the categories of release time at issue.

¶24        To further support their argument, the City and PLEA rely on the City's 37-year history of choosing to use release time to improve employer-employee relations and provide for an enduring framework for addressing employer-employee concerns. At the evidentiary hearing before the trial court, they presented evidence that release time officers viewed the permissive and non-binding aspects of the MOU discussed above as obligations and accordingly used the release time to provide representation and protect officers' rights and interests in the employer-employee relationship. But the City and PLEA have not shown that such course of dealing evidence can be used to establish consideration "for *Wistuber* purposes" or contradict express contract terms for such purposes. *Turken*, 223 Ariz. at 351 ¶ 41, 224 P.3d. at 167; *see also Keith Equipment Co. v. Casa Grande Cotton Finance Co.*, 187 Ariz. 259, 262, 928 P.2d 683, 686 (App. 1996)

(noting "[c]ourse of dealing does not . . . create a contract") (citing cases). Here, the record supports the trial court's finding that the express terms of the 2012–14 MOU release time provisions do not obligate PLEA to perform any duties in exchange for the release time.

¶25        On the record presented—including the unique aspects of the 2012–14 MOU described above—the City and PLEA have not shown that the trial court erred in finding that the City's expenditure for the release time was grossly disproportionate to what it received in return, given the lack of obligation imposed on PLEA in the 2012–14 MOU release time provisions. Because of the lack of such obligations on PLEA in the 2012–14 MOU, we need not address whether, if the obligations existed, they would be constitutional. *See State v. Rios*, 225 Ariz. 292, 296 ¶ 12, 237 P.3d 1052, 1056 (App. 2010) ("To the extent possible, [the court avoids] deciding constitutional issues if the case can be resolved on non-constitutional grounds."). We leave the constitutionality of such an MOU or other release time agreement for another day.

### 2. Attorneys' Fees and Costs on Appeal

¶26        Cheatham requests an award of costs pursuant to A.R.S. § 12–341 and attorneys' fees pursuant to the "private attorney general doctrine." *See Hassell*, 172 Ariz. at 371, 837 P.2d at 173. In our discretion, we deny Cheatham's request for attorneys' fees on appeal. Cheatham is, however, awarded taxable costs on appeal contingent upon compliance with Arizona Rule of Civil Appellate Procedure 21.

### CONCLUSION

¶27        For the foregoing reasons, we affirm the trial court's order to the extent that it enjoins the 2012–14 MOU release time provisions and to the extent that it enjoins the City and PLEA from entering into future MOUs or agreements with release time, unless they imposed upon PLEA binding obligations. We vacate the rest of the court's order.



Ruth A. Willingham · Clerk of the Court
FILED: RT